## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **ELIZABETH I LLC,** | **Case No. 26-10563 - CJP** |
| **Debtor.** | |

## DISCLOSURE STATEMENT WITH RESPECT TO
## PLAN OF REORGANIZATION OF
## DEBTOR AND DEBTOR-IN-POSSESSION

Dated: June 15, 2026

**BOWDITCH & DEWEY, LLP**
75 Federal Street, Suite 1000
Boston, Massachusetts  02110
Christopher M. Condon, Esq.
Telephone:  (617) 757-6513
Facsimile:  (508) 929-3099
Email: ccondon@bowditch.com

Counsel to Debtor

4918-8019-7301.1

## I.   INTRODUCTION[1]

Pursuant to Section 1125 of the United States Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"), Elizabeth I LLC (the "Debtor") provides this disclosure statement (the "Disclosure Statement") to all of the Debtor's known creditors and parties in interest.  The purpose of this Disclosure Statement is to provide the information deemed necessary for creditors to make an informed decision in exercising their rights to vote on the *Plan of Reorganization* dated as of the date of this Disclosure Statement (the "Plan").  The Debtor has filed the Plan simultaneously with the filing of this Disclosure Statement.  The description of the Plan in this Disclosure Statement is a summary and is qualified by reference to the actual terms and conditions of the Plan, which should be reviewed carefully before making a decision to accept or reject the Plan.

The information contained in this Disclosure Statement has been provided by the Debtor based upon the knowledge of the Debtor's records, business and affairs.  Except as otherwise expressly indicated, such information has not been subject to audit or independent review.  Although great effort has been made to be accurate, neither the Debtor nor its professional advisors warrant the accuracy of the information contained in this Disclosure Statement.

No representations concerning the Debtor, including the value of its Assets or the aggregate dollar amount of Claims which may be allowed, are authorized other than as set forth in this Disclosure Statement.  Any representations, warranties or agreements made to secure acceptance or rejection of the Plan that differ from those contained in this Disclosure Statement should not be relied upon in voting on the Plan.

This Disclosure Statement has been prepared by the Debtor to provide creditors with adequate information so that they can make an informed judgment about the Plan.  Each creditor should read this Disclosure Statement and the Plan in their entirety before voting on the Plan.  No solicitation of votes on the Plan may be made except pursuant to this Disclosure Statement, and no person has been authorized to utilize any information concerning the Debtor's business or Assets other than the information contained in this Disclosure Statement.

**Distributions to holders of Allowed Claims will be made as soon as practicable following the allowance of the Claim and the Effective Date of the Plan.  The Debtor projects that under the Plan all holders of Allowed Secured, Administrative, Priority Claims, and General Unsecured Claims will receive one-hundred percent (100%) of the amount of their Allowed Claims. THE DEBTOR RECOMMENDS ALL CREDITORS VOTE IN FAVOR OF THE PLAN.**

---

[1] A copy of the Plan is attached to this Disclosure Statement as Exhibit 1. Capitalized terms not otherwise defined in this Disclosure Statement have the meanings ascribed to them in the Plan.

1

## II.   SUMMARY OF THE PLAN

This Disclosure Statement has been prepared by the Debtor to provide creditors with adequate information so that they can make an informed judgment about the Plan.  Each creditor should read this Disclosure Statement and the Plan in their entirety before voting on the Plan.  No solicitation of votes on the Plan may be made except pursuant to this Disclosure Statement, and no person has been authorized to utilize any information concerning the Debtor's business or Assets other than the information contained herein for purposes of solicitation.

The Plan provides that the Debtor's principal asset, a certain piece of real estate located at 367 E Street in Boston, Massachusetts (the "Property") will be re-financed or sold and the proceeds made available for distribution to the holders of Allowed Secured, Administrative, Priority, and Unsecured Claims.  Such proceeds will exceed the amount of all Allowed Claims.

## III.   INFORMATION ABOUT THE REORGANIZATION PROCESS

### 3.1   Purpose Of Disclosure Statement

This Disclosure Statement includes background information about the Debtor and also identifies the Classes into which creditors and equity holders have been placed by the Plan.  In addition, this Disclosure Statement contains information concerning the treatment of creditors and equity holders in the event of confirmation or, in the alternative, the prospects if confirmation is denied or the proposed Plan does not become effective.

Upon approval by the Bankruptcy Court and in accordance with the provisions of the Bankruptcy Code, this Disclosure Statement and any exhibits will have been found to contain adequate information of a kind and in sufficient detail that would enable a reasonable, hypothetical investor typical of a holder of Impaired Claims to make an informed judgment about the Plan.  Approval of this Disclosure Statement by the Bankruptcy Court, however, does not constitute a recommendation by the Bankruptcy Court either for or against the Plan.

### 3.2   Ballots

Accompanying this Disclosure Statement is a ballot for acceptance or rejection of the Plan (a "Ballot").  Each party in interest entitled to vote on the Plan will receive a Ballot.  Claims in Classes 1-3 may be Impaired and may vote on the Plan.  Each member of Classes 1-3 will be asked to vote for acceptance or rejection of the Plan.

2

### 3.3      Voting Procedure

All creditors entitled to vote on the Plan may cast their votes for or against the Plan by completing, dating, signing and causing the Ballot accompanying this Disclosure Statement to be returned to the following address:

Christopher M. Condon, Esq.
Bowditch & Dewey, LLP
75 Federal Street, Suite 1000
Boston, Massachusetts 02110
ccondon@bowditch.com

Ballots must be completed in accordance with the instructions set forth therein and must be received at the address above by the deadline established by the Bankruptcy Court to be counted in the voting.  Ballots received after this deadline will not be counted in the voting unless the Bankruptcy Court so orders.

The Debtor recommends a vote to "ACCEPT" the Plan.

### 3.4      The Confirmation Hearing

The Confirmation Hearing will be held **on** _____ **, 2026 at** _____ **__.m.** at the United States Bankruptcy Court for the District of Massachusetts, Courtroom _____, 5 Post Office Square, 12th Floor, Boston, Massachusetts 02110 before Judge Christopher J. Panos.  At the hearing, the Bankruptcy Court will consider whether the Plan satisfies the various requirements of the Bankruptcy Code, including whether it is in the best interests of holders of Claims and Equity Interests.  The Bankruptcy Court will also receive and consider a Report of Plan Voting prepared by the Debtor and its agents and summarizing the votes for acceptance or rejection of the Plan by the parties entitled to vote.

### 3.5      Acceptances Necessary to Confirm Plan

At the Confirmation Hearing, the Bankruptcy Court must determine, among other things, whether each Impaired Class has accepted the Plan.  Under Section 1126 of the Bankruptcy Code, an Impaired Class of Claims is deemed to have accepted the Plan if at least two-thirds (2/3) in amount and more than one-half  (½) in number of the Claims of Class members who have voted to accept or reject the Plan have voted for acceptance of the Plan.  Unless there is acceptance of the Plan by all members of an Impaired Class, the Bankruptcy Court must also determine that Class members will receive under the Plan property of a value, as of the Effective Date, that is not less than the amount that such Class members would receive or retain if the Debtor was liquidated under Chapter 7 of the Bankruptcy Code on the Effective Date.

### 3.6      Confirmation of the Plan without the Necessary Acceptances.

The Plan may be confirmed notwithstanding that one or more Impaired Classes have not accepted the Plan if the Bankruptcy Court finds that the Plan does not discriminate unfairly against and is fair and equitable as to such Class or Classes.  This provision is set forth in Section

3

1129(b) of the Bankruptcy Code and requires that, among other things, the class of Claims or Equity Interests must either receive the full value of their Claims or Equity Interests or, if they receive less, no Class with junior distribution priority may receive or retain anything on account of such junior interest unless the junior class provides "new value" or other consideration to the Debtor.   The Debtor intends to proceed toward confirmation provided that at least one Impaired Class has voted to accept the Plan.  The Debtor reserves the right to seek to confirm the Plan under Section 1129(b) of the Bankruptcy Code.

## IV.   GENERAL INFORMATION

### 4.1   Description of the Debtor

The Debtor is a Massachusetts limited liability company formed to acquire and operate real property.

On June 28, 2024, the Debtor closed on a loan from Nextres, LLC in connection with the acquisition and operation of the property located at 367 E Street, Boston, Massachusetts (the "Property") in the original principal amount of $840,000 (the "Loan").

Two weeks later, Nextres, LLC apparently assigned the Loan to Toorak Capital Partners, LLC (the "Note Buyer").  The Note Buyer moved to foreclose on the Property after acquiring the Loan.

The Debtor took steps to pay the Note Buyer and avoid foreclosure.  Among other things, the Debtor paid the Note Buyer $100,000, to be credited toward the obligations under the Loan, and to extend the payoff date under the Loan.  In between January 7, 2026 and January 19, 2026, the Debtor worked to pay off the Loan to the Note Buyer.  On or about January 19, 2026, the Note Buyer demanded another $150,000 payment in order to not foreclose on the Property. On or about February 9, 2026, the Debtor paid to the Note Buyer another $150,000, to be credited toward the obligations under the Loan, in exchange for an extension of the scheduled foreclosure auction to March 11, 2026.

The Debtor moved forward to refinance the Loan and provide payment in full to the Note Buyer.  The Debtor arranged with Broadfield Realty Capital ("Broadfield") for a re-financing of the Property which would have provided for payment to the Note Buyer and the Debtor's junior creditors in full.

The Debtor asserts, among other things, that the Note Buyer failed to comply with applicable law regarding providing appropriate payoff amounts, which rendered the planned refinancing impossible.  When the Note Buyer did provide a payoff, it was in the amount of $1,081,522, substantially higher than permitted under the note.

The Debtor was not able to fund the additional $175,000 which the Note Buyer asserted to be owed and was forced to commence this Chapter 11 case on March 17, 2026 solely to preserve its rights to the Property and consummate the financing to repay its creditors in full. After the commencement of the case, the Debtor received a Mortgage Payoff Statement from the Note Buyer's loan servicer, FCI Lender Servicers, Inc., in the amount of $907,978.

4918-8019-7301.1

Mr. Bruce Bookbinder, the holder of the third-priority mortgage on the Property, purports to have conducted a foreclosure auction of the Property on or about March 16, 2026.  The Debtor asserts that such auction was improperly noticed or otherwise conducted, as is evidenced by the fact that no bidders appeared at the purported auction.  Among other things, the Debtor asserts that the purported foreclosure procedures employed by Mr. Bookbinder violated M.G.L. c. 183 and 244.

### A.  Assets

The Property is the Debtor's principal asset.  The Debtor values the Property at $2,400,000, based upon the Debtor's comparative market analysis.   The value of the Property substantially exceeds even the inflated amount ascribed to the Loan by the Note Buyer.  The Property is occupied and the Debtor's tenants pay the real estate taxes, insurance, utility and maintenance charges of the Property directly to the respective creditors.

The Debtor may have claims against the Note Buyer and Mr. Bookbinder on account of their respective pre-petition and post-petition collection activities as further described herein.

### B.  Liabilities

As set forth below, the Debtor asserts that creditors holding liens against the Property hold claims in the approximate amount of $2,000,000.   Certain creditors assert to be owed more than the Debtor calculates.  The Debtor disputes these amounts.

## V.     SIGNIFICANT POST PETITION EVENTS

The Debtor has operated as a debtor and debtor-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code since the Petition Date.  No committee or trustee has been appointed in the Debtor's Chapter 11 case.

The Debtor has filed its schedules of assets and liabilities [ECF Nos. 50, 51, 63].

The Property is insured.

On May 22, 2026, the Bankruptcy Court entered an order authorizing the retention of Bowditch & Dewey, LLP ("Bowditch") as chapter 11 counsel to the Debtor [ECF No. 60].

The Debtor has been in negotiations with Broadfield Realty Capital ("Broadfield") for a re-financing of the Property.  Broadfield has successfully refinanced several other properties owned by the Debtor's equity holder and related parties.

The Debtor has determined that Mr. Bookbinder has apparently determined to record his purported foreclosure deed after the filing of this case.  Among other things, Broadfield performed a title examination in connection with the proposed refinancing and discovered that the Property was titled in the name of Mr. Bookbinder.  Mr. Bookbinder's recording of the supposed foreclosure deed post-petition is a clear violation of the automatic stay.  If this matter

4918-8019-7301.1

cannot be shortly resolved, the Debtor will file an adversary proceeding against Mr. Bookbinder and related parties to seek appropriate relief from the Court.

## V.    DESCRIPTION OF THE PLAN

The Debtor plans to refinance or sell the Property to fund payments to creditors under the Plan.   The Debtor believes that the value of the Property substantially exceeds the amount of Allowed Claims.  After payment of Secured, Administrative, Priority Claims, General Unsecured Claims, and payment of, or reservation for, the amounts necessary to administer the Plan, the balance of any sale proceeds will be distributed to the Debtor.

The tenants of the Property are relatives of or otherwise related to Mr. Collins.  The Debtor has been working to redevelop the Property.  If the property is refinanced, thereafter the Debtor intends to redevelop the Property and replace the current tenants with market-rate tenants.

### A.    Unclassified Claims

### 6.1    Administrative Expense Claims.

The Administrative Expense Claims consist principally of the Professional Fee Claims accrued and unpaid since the Petition Date.  Any commission earned by OPAC will be payable from the proceeds of the sale or refinancing of the Property.  Bowditch has not received any compensation for its services, which are subject to application pursuant to Section 330 of the Bankruptcy Code.  Bowditch estimates that its accrued and unpaid fees and expenses through June 12, 2026 total approximately $30,000.  Bowditch holds a retainer of $20,000.

Under the Plan, the bar date for asserting Administrative Expense Claims is thirty (30) days after the Effective Date.  Administrative Expense Claims are treated as follows:

(a)    **General Administrative Claims**.  Each holder of an Allowed Administrative Expense Claim shall be paid in full in Cash on the later of: (i) the date such Allowed Administrative Expense Claim becomes due in accordance with its terms; and (ii) the Effective Date

(b)    **U.S. Trustee's Fees.**  The outstanding fees due to the United States Trustee pursuant to 11 U.S.C. § 1930 shall be paid in full on or before the Effective Date.

(c)    **Professional Fee Claims**. Each Professional may file an application for the allowance of compensation for services rendered or reimbursement of expenses incurred through and including the Effective Date within thirty (30) days after the Effective Date. Any such application granted by the Bankruptcy Court shall be paid upon the earlier of the Effective Date or within ten (10) days of the entry of the order of the Bankruptcy Court approving such application, unless a stay of the order approving the application is obtained

### 6.2    Priority Tax Claims.

6

4918-8019-7301.1

The Debtor is unaware of Priority Tax Claims asserted against its estate.

Treatment: Under the as soon as reasonably practicable after the later of (a) the Effective Date or (b) the date on which a Priority Tax Claim becomes an Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim shall receive, in full and final satisfaction, settlement, and release of, and in exchange for, such Allowed Priority Tax Claim, (i) payment in accordance with Section 1129(a)(9)(C) of the Bankruptcy Code, or (ii) payment as agreed between the holder of the Allowed Priority Tax Claim and the Reorganized Debtor.

### B.      Classified Claims

### 6.3      Class 1 – Secured Claims.

The Note Buyer asserts a claim against the Debtor in the approximately amount of $1,080,000.  The Debtor asserts that the Note Buyer is owed approximately $907,000 in accordance with the loan servicer's notice of March 7, 2026.  In the event this cannot be resolved, the Debtor will file an objection to the claim of the Note Buyer.  The Note Buyer's claim is secured by a first-priority lien on the Property.  Paul Linder holds a second-priority lien on the Property to secure a debt of approximately $700,000. Mr. Linder asserts to be owed approximately $900,000, which the Debtor disputes.  If this matter cannot be resolved, the Debtor will file an objection to Mr. Linder's claim.  Mr. Bookbinder holds a claim of approximately $600,000 against the Property.  Mr. Bookbinder asserts to be owed approximately $700,000, which the Debtor disputes.  In addition, as set forth above, Mr. Bookbinder asserts to have taken title to Property post-petition.  The Debtor believes that it will be able to undo this supposed transfer whether by agreement or through an appropriate proceeding before the Court.

The Allowed Class 1 Claims may be impaired and the holder of such Allowed Secured Claim is entitled to vote to accept or reject the Plan.

In full and complete satisfaction, settlement, release and discharge of an Allowed Claim, the holder of an Allowed Class 1 Claim shall receive payment in full of its Allowed Claim as follows: (i) in Cash, (ii) from the Net Proceeds of any sale or refinancing of the Property, (iii) in monthly installments of principal and interest, based on interest at a rate of seven and three-quarter percent (7¾ %) per annum and a thirty (30) year amortization with all unpaid principal and interest due at the end of the 60th month following the Effective Date; provided that, the outstanding amount due may be pre-paid at any time without penalty,  (iv) upon such terms as is agreed to in writing between the Debtor and the holder of the Allowed Class 1 Claim, or (v) upon such terms as may be determined by the Bankruptcy Court.  The holder of the Allowed Class 1 Claim shall retain its Lien to secure the amount of its Allowed Claim until such time as the Allowed Class 1 Claim is paid in full.

### 6.4      Class 2- Miscellaneous Secured Claims.

The Debtor is unaware of any Class 2 Claims.

Allowed Class 2 Claims may be impaired and the holder of such Allowed Miscellaneous Secured Claims are entitled to vote to accept or reject the Plan.

In full and complete satisfaction, settlement, release and discharge of its Allowed Claim, the holder of an Allowed Class 2 Claim shall receive payment in full of its Allowed Claim as follows: (i) in Cash, (ii) from the Net Proceeds of any sale or refinancing of the Property, (iii) in monthly installments of principal and interest, based on interest at a rate of seven and three-quarter percent (7¾ %) per annum and a thirty (30) year amortization with all unpaid principal and interest due at the end of the 60th month following the Effective Date; underline provided that, the outstanding amount due may be pre-paid at any time without penalty, (iv) upon such terms as is agreed to in writing between the Debtor and the holder of the Allowed Class 2 Claim, or (v) upon such terms as may be determined by the Bankruptcy Court.  The holder of an Allowed Class 2 Claim shall retain its Lien to secure the amount of its Allowed Claim until such time as the Allowed Class 2 Claim is paid in full.

### 6.5    Class 3 – General Unsecured Claims.

The Debtor estimates that the total amount of Class 3 claims is approximately than $50,000 based upon the schedules of assets and liabilities filed in the case.

Allowed Class 3 Claims may be impaired and the holder of such Allowed General Unsecured Claims are entitled to vote to accept or reject the Plan.

Commencing upon the later of the 30th day following the Effective Date or such date as the Claim becomes an Allowed Claim, in full and complete satisfaction, settlement, release and discharge of the Allowed General Unsecured Claims, the holders of Allowed General Unsecured Claims shall receive payment of their Allowed General Unsecured Claims: (i) in Cash, (ii) from the Net Proceeds of the sale of the Property, (iii) in equal monthly installments for a period of six (6) months following the Effective Date, (iv) upon such terms as is agreed to in writing between the Debtor and the holder of an Allowed Class 3 Claim, or (v) upon such terms as may be determined by the Bankruptcy Court.

### 6.6    Class 4 – Equity Interests.

Class 4 is presumed to be unimpaired under the Plan and is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan on account of its Equity Interests.

The Debtor retains its equity interests under the Plan and receives the remainder of the Assets, if any, after payment in full of all Allowed classified and unclassified claims in the Debtor's chapter 11 case.

### VI.    MEANS FOR IMPLEMENTATION OF THE PLAN

Effect of Confirmation.  Confirmation of the Plan shall constitute authorization for the Debtor or the Reorganized Debtor to: (i) effectuate the Plan and to enter into all documents, instruments and agreements reasonably necessary to effectuate the terms of the Plan, and (ii)

4918-8019-7301.1

liquidate any Assets remaining after the Effective Date.  The Debtor shall remain in existence as the Reorganized Debtor until dissolved pursuant to the Plan.

Vesting of Assets.  The Assets shall vest in the Reorganized Debtor on the Effective Date.  Except as may be expressly provided in the Plan or a Final Order of the Bankruptcy Court, no Assets shall be deemed abandoned and no defense, set-off, counterclaim or right of recoupment of the Debtor shall be deemed waived, released or compromised

Preservation of Causes of Action.  Except as provided in the Plan, and unless expressly waived, released, compromised or settled by Final Order of the Bankruptcy Court, the Reorganized Debtor will exclusively retain and may enforce, any Claims, Causes of Action and demands and rights relating thereto that the Debtor or the Estate may hold against any person or entity.

Default.  No event of default under the Plan shall occur unless, in the event of a breach of the Reorganized Debtor's obligations under the Plan, the holder of the Allowed Claim asserting the default shall provide written notice of such breach to the Reorganized Debtor and such breach is not cured: (i) in the event of a breach that can be cured by the payment of a sum of money, within ten (10) days of the Reorganized Debtor's receipt of such notice; and (ii) for any other breach, within thirty (30) days of the Reorganized Debtor's receipt of such notice, provided that, if such non-monetary breach cannot reasonably be cured within such 30-day period and the Reorganized Debtor has commenced curing such breach and continues to cure such breach, the thirty (30) day period shall be extended for such time as is reasonably necessary to cure such breach.

Retention of Professionals.  The Reorganized Debtor may retain such attorneys (including special counsel) accountants, advisors, expert witnesses, and other professionals as he considers advisable without necessity of approval of the Court.  Persons who served as Professionals to the Debtor prior to the Effective Date may provide services to the Reorganized Debtor.

Final Decree.  The Reorganized Debtor shall be authorized to prepare and file a motion requesting that the Court enter a Final Decree in the Bankruptcy Case.

4918-8019-7301.1

## VII.    DISTRIBUTIONS ON CLAIMS AND EQUITY INTERESTS AND RESOLUTION OF DISPUTED CLAIMS

**8.1    Method and Timing of Distributions under the Plan.**

(a)    The Reorganized Debtor, shall make all distributions to holders of Allowed Claims in accordance with the terms of the Plan.  Distributions shall be made at such times and in such amounts as is determined by the Reorganized Debtor.  The recipients of distributions under the Plan shall comply with any reporting requirements of the Reorganized as a condition to payment.

(b)    <u>In General</u>.  Subject to Bankruptcy Rule 9010, and except as otherwise provided in the Plan, all distributions under the Plan to be made by, or on behalf of, the Reorganized Debtor to the holder of each Allowed Claim shall be mailed by first class mail, postage prepaid, to the address of such holder as listed on the Schedules unless the Reorganized Debtor  has been notified in writing of a change of address as of the Distribution Record Date, including, without limitation, by the filing of a proof of claim or notice of transfer of claim filed by such holder that provides an address for such holder different from the address reflected on the Schedules.  The Reorganized Debtor shall have no obligation to locate such holders whose distributions or notices are properly mailed but nevertheless returned.

(c)    <u>Form of Distributions</u>.  Except as otherwise provided in the Plan, any payment of Cash made by, or on behalf of, the Reorganized Debtor pursuant to the Plan shall be made by check.

(d)    <u>Distributions to Holders as of the Distribution Record Date</u>.  The Reorganized Debtor shall be entitled to rely upon the register of Claims as of the Distribution Record Date. Any transfers of an Allowed Claim shall be recognized ten (10) days after written notice of such transfer is received by the Reorganized Debtor as provided herein.

**8.2    Objections to Disputed Claims.**

The Reorganized Debtor may file any objections to Claims against the Debtor.

**8.3    Deadline for Objecting to Disputed Claims.**

Except as otherwise provided by order of the Bankruptcy Court, the Reorganized Debtor may file an objection to a Claim against the Debtor until the later of: (a) the date that such Claim becomes due and payable in accordance with its terms, or (b) ninety (90) days after the Effective Date.

**8.4    Estimation of Claims.**

After the Effective Date, the Reorganized Debtor may, at any time, request that the Bankruptcy Court estimate any Disputed Claim pursuant to Section 502(c) of the Bankruptcy Code regardless of whether the Debtor or the Reorganized Debtor has previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection.

4918-8019-7301.1

**8.5** **Disputed Claims Reserve.**

(a)     Establishment.  A reserve shall be maintained equal to 100% of the distributions to which holders of Disputed Claims would be entitled under the Plan if such Disputed Claims were Allowed Claims or such lesser amount as required by a Final Order.

(b)     Investment of Cash.  Cash in the Disputed Claims Reserve may be invested only in Cash Equivalents having maturities sufficient to enable the holder of the Dispute Claim Reserve to make all necessary payments to holders of Disputed Claims if, and when, such Disputed Claims become Allowed Claims.  Any interest, income, distributions or accretions on account of such investment in Cash Equivalents in the Disputed Claims Reserve shall be for the sole benefit and account of the Reorganized Debtor, and the Reorganized Debtor shall be solely responsible for the payment of any income or other taxes arising therefrom.

(c)     Distributions upon Allowance of Disputed Claims.  The holder of a Disputed Claim that becomes an Allowed Claim after the Effective Date shall receive distributions of Cash from the Disputed Claims Reserve as soon as practicable following the date on which such Disputed Claim becomes an Allowed Claim pursuant to a Non-Appealable Order.  Such distributions shall be made in accordance with the Plan based upon the distributions that would have been made to the holder of such a Claim under the Plan if the Disputed Claim had been an Allowed Claim on or prior to the Effective Date.  No holder of a Disputed Claim shall have any claim against the respective Disputed Claims Reserve or the Reorganized Debtor with respect to such Claim until the Disputed Claim shall become an Allowed Claim.

**8.6** **Reversion of Unclaimed Checks.**

The following amounts shall revert to and be vested in the Reorganized Debtor free and clear of any claim or interest of any holder of a Claim under the Plan: (a) the amount of any checks issued for distributions to the holders of Allowed Claims under the Plan that remain uncashed for a period of 180 days after the date of such distribution; and (b) to the extent that a Disputed Claim is not Allowed or becomes an Allowed Claim in an amount less than the Disputed Claim Amount, the excess of the amount of Cash or Cash Equivalents in the Disputed Claims Reserve attributable to such Disputed Claim over the amount of Cash actually distributed on account of such Disputed Claim.

## IX.   VOTING AND PLAN CRAMDOWN

**9.1**   **Voting of Claims.**  Each holder of an Allowed Claim in an impaired Class that retains or receives property under the Plan shall be entitled to vote separately to accept or reject the Plan. Each holder of the foregoing Allowed Claims electing to vote shall do so on a duly executed and delivered ballot and in accordance with procedures set forth in the applicable order of the Bankruptcy Court establishing Plan voting procedures.

**9.2**   **Nonconsensual Confirmation.**  If any impaired Class entitled to vote does not accept this Plan by the requisite majorities provided in Sections 1126(c) or 1126(d) of the Bankruptcy Code, as applicable, or if any impaired class is deemed to have rejected the Plan, the

4918-8019-7301.1

Debtor reserves the right to: (a) seek confirmation of the Plan under Section 1129(b) of the Bankruptcy Code, and/or (b) amend the Plan in accordance with Section 12.3 of the Plan.

## X.     EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### 10.1     Rejection of Executory Contracts And Unexpired Leases.

Pursuant to Sections 1123(b)(2) and 365(a) of the Bankruptcy Code, any Executory Contract or Unexpired Lease (excluding insurance policies) that (a) has not expired by its own terms, or is not subject to a notice of termination by the Debtor, on or prior to the Confirmation Date, (b) has not been assumed, assumed and assigned or rejected with the approval of the Bankruptcy Court on or prior to the Confirmation Date, (c) is not the subject of a motion to assume or reject which is pending at the time of the Confirmation Date, or (d) is not designated by the Debtor as being an Executory Contract or Unexpired Lease to be assumed at the time of Confirmation of the Plan, shall be deemed rejected on the Effective Date.

### 10.2     Rejection Damage Claims.

If the rejection of an executory contract or unexpired lease by the Debtor results in a Claim by the other party or parties to such contract or lease, any claim for such damages, if not previously evidenced by a filed proof of claim, shall be forever barred and shall not be enforceable against the Estate, the Reorganized Debtor and its respective properties, agents, successors, or assigns, unless a proof of claim is filed with the Bankruptcy Court and served upon counsel for the Debtor on or before thirty (30) days following the Confirmation Date.

## XI.     RELEASE AND SATISFACTION OF CLAIMS

### 11.1     Discharge/Injunction under the Plan.

(a)     Discharge. As of the Effective Date, all Persons are hereby permanently enjoined from commencing, continuing or enforcing in any manner or in any place, any action or other proceeding, whether directly, indirectly, derivatively or otherwise against the Debtor, the Estate, and/or the Reorganized Debtor, on account of, or respecting any Claims, debts, rights, obligations, Causes of Action or liabilities against the Debtor, except to the extent expressly permitted under the Plan.

(b)     Injunction. All Persons are hereby permanently enjoined from commencing or continuing, in any manner or in any place, any action or other proceeding, whether directly, indirectly, derivatively or otherwise against the Debtor, the Estate or the Reorganized Debtor on account of, or respecting any Claims, debts, rights, Causes of Action or liabilities discharged pursuant to this Plan, except to the extent expressly permitted under this Plan.

### 11.2     Releases by Holders of Claims.     Except as otherwise set forth in the Plan, as of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, (a) each holder of a Claim that votes in favor of the Plan and (b) to the fullest extent permissible under applicable law, as such law may be extended or interpreted subsequent to the Effective Date, each Person that has held, holds or may hold a Claim or at any time was a

12

4918-8019-7301.1

creditor of the Debtor and that does not vote on the Plan or votes against the Plan, in each case will be deemed to forever release and waive all claims (including any derivative claims), obligations, suits, judgments, damages, demands, rights, causes of action and liabilities (other than the right to enforce the Reorganized Debtor's obligations under the Plan and the contracts, instruments, releases, agreements and documents delivered under the Plan), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising in law, equity or otherwise, that are based in whole or in part on any act, omission, transaction, event or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtor, the Estate, the Bankruptcy Case or the Plan that such entity has, had or may have against the Debtor, or the Estate.

**11.3    Cancellation of Existing Indebtedness and Liens.**  Except as may otherwise be provided in the Plan, on the Effective Date: (a) all credit agreements, promissory notes, mortgages, security agreements, invoices, contracts, agreements and any other documents or instruments evidencing Claims against the Debtor, together with any and all Liens securing same, shall be canceled, discharged and released without further act or action by any Person under any applicable agreement, law, regulation, order or rule, (b) the obligations of the Debtor thereunder shall be deemed cancelled and released, and (c) all of the right, title and interest of any holder of such mortgages, deeds of trust, Liens or other security interests, including any rights to any collateral thereunder, will revert to the Reorganized Debtor.  Upon request, any holder of a Claim shall promptly provide the Reorganized Debtor with an appropriate instrument of cancellation, discharge or release, as the case may be, in suitable form for recording wherever necessary to evidence such cancellation, discharge or release, including the cancellation, discharge or release of any Lien securing such Claim.

**11.4    Exculpation.**  Except as otherwise set forth in the Plan, none of the Debtor, the Reorganized Debtor or any of their respective employees, advisors, attorneys, agents, successors or assigns, shall have or incur any liability to any holder of a Claim or an Interest, or any other party in interest, or any of their respective agents, employees, representatives, financial advisors, attorneys, or affiliates, or any of their successors or assigns, for any act or omission in connection with, relating to, or arising out of, the administration of the Bankruptcy Cases, the pursuit of confirmation of the Plan, the Disclosure Statement, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan occurring prior to the Effective Date, provided that the terms of this Section 9.6 shall not apply to any liability for willful misconduct or ultra vires acts.

**11.5    Setoffs.**  Except as otherwise provided in the Plan, nothing contained in the Plan shall constitute a waiver or release by the Estate of any rights of setoff the Estate may have against any Person. Neither the failure to setoff nor the allowance of any Claim under the Plan shall constitute a waiver or release of any Claims that the Debtor or the Reorganized Debtor, as applicable, may have against the holder of any Claim.

## XII. TAX ISSUES

In General.  The federal income tax consequences of the implementation of the Plan to a holder of a Claim will depend, among other things, on: (a) whether such Claim constitutes a debt or a security for federal income tax purposes, (b) whether the holder of the Claim receives

13

4918-8019-7301.1

consideration in more than one (1) tax year, (c) whether the holder of the Claim is a resident of the United States, (d) whether all the consideration received by the holder of the Claim is deemed to be received by the holder of the  Claim as part of an integrated transaction, (e) whether the holder of the Claim reports income using the accrual or cash method of accounting, (f) whether the holder has previously taken a bad debt deduction or worthless security deduction with respect to the Claim, and (g) whether the Claim was acquired at a discount and whether the market discount rules are applicable to the holder.

Gain or Loss on Exchange.  Generally, a holder of an Allowed Claim will realize a gain or loss on the exchange under the Plan of his or her Allowed Claim for cash and other property in an amount equal to the difference between (i) the sum of the amount of any cash and the fair market value on the date of the exchange of any other property received by the holder (other than any consideration attributable to accrued but unpaid interest on the Allowed Claim), and (ii) the adjusted basis of the Allowed Claim exchanged therefor (other than basis attributable to accrued but unpaid interest previously included in the holder's taxable income).

Any gain recognized generally will be a capital gain if the Claim was a capital asset in the hands of an exchanging holder, and such gain would be a long-term capital gain if the holder's holding period for the Claim surrendered exceeded one (1) year at the time of the exchange.  Any loss recognized by a holder of an Allowed Claim will be a capital loss if the Claim constitutes a "security" for federal income tax purposes or is otherwise held as a capital asset.  For this purpose, a "security" is a debt instrument with interest coupons or in registered form.

**THE FOREGOING IS INTENDED TO BE A SUMMARY ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL.  THE FEDERAL, STATE, AND FOREIGN TAX CONSEQUENCES OF THE PLAN ARE COMPLEX AND, IN MANY AREAS, UNCERTAIN.  ACCORDINGLY, EACH HOLDER OF A CLAIM OR EQUITY INTEREST IS STRONGLY URGED TO CONSULT WITH HIS OWN TAX ADVISOR REGARDING SUCH TAX CONSEQUENCES.**

## XIII.   PLAN FEASIBILITY

In order to confirm the Plan, the Debtor must demonstrate that he can make the payments called for under the Plan. The Plan calls for the refinance, sale or other use of the Property to generate proceeds to pay creditors. The Property is capable of generating sale or refinancing proceeds sufficient to satisfy the Claims against the Debtor. The Plan is therefore feasible and confirmation of the Plan is not likely to be followed by liquidation or the need for further financial reorganization by the Debtor.

## XIV.   BEST INTERESTS OF CREDITORS

As a condition to confirmation of the Plan, Section 1129(a)(7)(A)(ii) of the Bankruptcy Code requires that each impaired Class of Claims or Equity Interests must receive or retain at least the amount or value it would receive if the Debtor were liquidated under Chapter 7 of the

4918-8019-7301.1

Bankruptcy Code on the Effective Date of the Plan. In a Chapter 7, the Debtor's assets would be sold under a forced liquidation scenario.

    a. <u>The Plan</u>. The Property is capable of generating through a private third-party sale or refinancing sufficient funds to make the distributions required under the Plan. Based upon the valuation of the Property, the Debtor does not believe that upon the sale of the Property it will be subject to any capital gains tax which would diminish its ability to pay its creditors.

    b. <u>Liquidation</u>. Unlike the Plan, the Debtor believes that under liquidation scenario, unsecured creditors would receive no distribution based upon the reduced value of the Property and the attendant costs of liquidation including the appointment of a trustee which are entitled to administrative priority under the Bankruptcy Code.

Based upon the foregoing, the Debtor submits that confirmation of the Plan is in the best interests of creditors.

ELIZABETH I LLC,

/s/ *Christopher M. Condon*
Christopher M. Condon (BBO #652430)
BOWDITCH & DEWEY, LLP
75 Federal Street, Suite 1000
Boston, Massachusetts 02110
Tel: (617) 757-6513
Date: June 15, 2026                    Email: ccondon@bowditch.com

ELIZABETH 1 LLC,

/s/ *Andrew Collins*
By: Andrew Collins
Its: Owner

15

4918-8019-7301.1